STATE OF MAINE
PENOBSCOT, ss.

SUPERIOR COURT
CIVIL ACTION NO.
AP-01-26
AMM - PEN - 5/23/2002

PATRICIA LEAVITT, )
            Petitioner )
                       )
                       )
v.                     )
                       )
                       )
STATE OF MAINE,        )
                       )
and                    )
                       )
BOARD OF TRUSTEES, MAINE )
STATE RETIREMENT SYSTEM, )
                       )
and                    )
                       )
EXECUTIVE DIRECTOR, MAINE )
STATE RETIREMENT SYSTEM, )
            Respondents )

DONALD L. GARBRECH
LAW LIBRARY

AUG 20 2002

ORDER AND DECISION ON
PETITIONER'S 80C APPEAL

FILED & ENTERED
SUPERIOR COURT

MAY 23 2002

PENOBSCOT COUNTY

The matter before the court is the 80C Appeal of the petitioner, Patricia Leavitt ("Leavitt"), from a decision of the Maine State Retirement System (the "MSRS") denying her application for disability retirement benefits. Although the court is sympathetic to Leavitt's situation, for the following reasons, it must affirm the decision.

## BACKGROUND

Leavitt was employed as a receptionist by Eastern Maine Technical College ("EMTC") from May 18, 1992 to February 4, 1998. On February 4, 1998, Leavitt left her employment pursuant to medical advice from her treating physician; she suffers from spasmodic torticollis, or dystonia.[1]

Leavitt has suffered from spasmodic torticollis since 1979 and, since 1990, has been seen for this condition by Charles Burger, M.D., her primary care physician. In 1991, she began Botox injections and had good results. However, her response to the medication progressively decreased. Burger's office notes state that in 1993 "in situations of stress [Leavitt's] head would turn suddenly to the right," and that

---

1. Spasmodic torticollis is a neurological condition thought to originate in the basal ganglia of the brain. An overabundance of acetylcholine is secreted from the basal ganglia through the nerve pathways to certain muscles of the neck. Where they meet, spasms occur which causes the head to be pulled either sideways toward either shoulder, to remain upright but be turned, to be pulled backward, or to be pulled forward.

"research indicates that if process stays at this level for 5 years, prognosis is good for condition to stabilize . . . ."

In September 1995, Leavitt requested an ergonomic evaluation of her workspace. EMTC hired a company to evaluate her workspace, and make recommendations. The Board went on the assumption that EMTC followed through on none of the recommendations.[2]

By November 1996, Leavitt began showing "increased symptoms." She had "increased neck problems, but also note[d] with certain activities in position she develop[ed] tingling that extend[ed] from her neck down her right arm. It particularly occur[red] when she turn[ed] her head to the right or tip[ped] it back and to the right. She[] noted this while she ha[d] been typing, driving, and other similar activities." Dr. Bruce Sigsbee, Leavitt's neurologist, noted that Leavitt "continues to work, but we talked about changing her hours. Too much use of her arms typing and other similar activities can in a major way aggravate this problem and lead to possible accelerated disability." By December 5, 1996, Leavitt had begun physical therapy, and "decreased her work hours to half days 5 days a week," although those work hours changed to full Mondays and half days Tuesdays through Thursday at a later point.

By January 1997, Leavitt "seem[ed] to have built up an antibody to botaox [sic], therefore [the] injections [were] no longer effective." Leavitt then switched to Relafin, which cut her pain in half. By December 1997, Leavitt was again "demonstrat[ing] an increase in spasmodic torticollis . . . ."

After leaving work in February 1998, Leavitt saw Burger in March and said that being out of work helped her feel better. Burger noted, however, that she was still getting pain down the back of her right leg when driving. In April 1998, Leavitt felt she could not return to work with the stress and achieve good pain control. In fact, Burger stated that Leavitt's condition was

> significantly exacerbated by needing to work in front of a computer or word processor. That position is uncomfortable for anybody with neck and shoulder problems and hers particularly, is significantly worsened by it.
>     The continuous pain because of the torticollis and secondary severe osteoarthritis of her neck does very definitely have an effect on her

---

2. The Board stated that "it has been assumed that the employer failed to make required job modifications. The factual issued was never addressed at an administrative hearing."

concentration, focus, and energy.

Since she has taken some leave from work, her condition has significantly improved and I believe will worsen again if she has to go back to work at that same position.

As a receptionist, Leavitt's job duties included operating a switchboard, sorting and distributing U.S. mail, and clerical support. As for the sorting and distributing of mail, the Board found:

This employment responsibility was restructured in October, 1997. Prior to the restructuring, Ms. Leavitt was responsible for sorting in-coming U.S. mail into approximately 100 boxes that were against a wall. The mail came once a day and it took her approximately an hour to sort and place the mail in the individual mailboxes. Interoffice mail was sorted and put into the boxes by others, most usually department secretaries. After the restructuring, Ms. Leavitt was responsible for both the U.S. mail and interoffice mail, which consisted of inter-campus and inter-facility mail. As a result the volume of mail increased significantly and she testified she was distributing the mail up to 10 times a day, although the office policy was that the mail be distributed once in the morning and once in the afternoon. At times, she was also requested to distribute the mail in order to meet certain deadlines. In addition, new mailboxes were installed which were located in three sections; each section was enclosed by a security gate which was locked with a key. The new boxes were smaller which required Ms. Leavitt to curl the mail so it would fit into the box. Ms. Leavitt also testified that she took Mary Kay cosmetic reorders over the phone in the evenings, but that she stopped performing this job in February, 1998, because it was too difficult. ***

Ms. Leavitt's testimony regarding the change in duties as a result of the restructuring was corroborated by that of Deborah Ray who performed the other 20 hours of the position each week. Ms. Ray stated that after the reorganization, distributing the mail became the main focus of the job. Sharon Greenleaf, a vocational expert, testified that the increased demands of Ms. Leavitt's position made it impossible for her to continue in her position.

On April 27, 1998, Leavitt applied for disability retirement benefits from the MSRS. The Chief Deputy Director of the MSRS, Gail Drake Wright ("Wright") denied Leavitt's application. In the notification letter to Leavitt dated December 4, 1998, Wright stated:

The information that has been reviewed indicates that you have less than five continuous years of creditable service and that your spasmodic torticollis pre-exists your membership in the Retirement System. Because this condition is a pre-existing condition, the statute requires that in order to be eligible for disability retirement benefits, you must show that in addition to there being a permanent incapacity that makes it impossible for you to perform the duties of

3

your employment position, there has been a substantial aggravation of your incapacity relating to this condition caused by an accident or injury received in the line of duty but from events or circumstances not usually encountered within the scope of your employment. You have not shown that there has been an injury or accident and the statute requires that the standard of 'substantial aggravation' be met in order to be eligible for a disability benefit. Since you have not made this showing, you cannot therefore be eligible for a benefit. Therefore, we are not making a determination whether this condition is permanent, and whether it results in functional limitations that make it impossible to perform the duties of your employment position.

Leavitt appealed Wright's decision to the MSRS Board of Trustees (the "Board"). After a lengthy factfinding process, the Board agreed with Wright and issued a decision dated June 26, 2001, in which it found:

that the increased workload 'substantially aggravated' [Leavitt's] pre-existing condition. *** However, according to the administrative record developed, the job of distributing the mail after October 1997, did not constitute an event or circumstance not usually encountered within the scope of [Leavitt's] employment. [Leavitt's] job description included the caption 'Mail Processing' and required her to, *inter alia*, distribute 'incoming US mail and packages and campus mail.' As a result she and her co-worker were the primary individuals responsible for distributing the mail. Given these facts, distributing the interoffice mail is not a task that would be beyond the usual activities set forth in her job description and therefore is not an 'event or circumstance not usually encountered within the scope' of [Leavitt's] employment. Even if 'campus mail' differs from 'interoffice mail' and therefore Ms. Leavitt became responsible for a new aspect of distributing the mail as [Leavitt] asserts, this duty became a *de facto* part of her job duties and therefore not an event outside the scope of her employment.

Leavitt appealed this decision to the Superior Court. Leavitt first asks the court to reverse the decision of the MSRS and find that the failure of Leavitt's employer to make appropriate job modifications is an event or circumstance not usually found within the scope of one's employment, and that that failure substantially aggravated her spasmodic torticollis.

## DISCUSSION

"[A]ny person who is aggrieved by final agency action shall be entitled to judicial review thereof in the Superior Court . . . ." 5 M.R.S.A. § 11001 (1). See 5 M.R.S.A. § 17451 (2). On review, the court may either affirm, remand, reverse, or modify the agency's decision. 5 M.R.S.A. § 11007 (4). The court's "review shall be confined to the

4

record upon which the agency decision was based . . . ." 5 M.R.S.A. § 11006 (1). "The court shall not substitute its judgment for that of the agency on questions of fact." 5 M.R.S.A. § 11007 (3). "The standard of review is limited to whether the governmental agency abused its discretion, committed an error of law, or made findings not supported by substantial evidence in the record." Seider v. Board of Examiners of Psychologists, 2000 ME 206, ¶ 8, 762 A.2d 551, 555 (Me. 2000) (quotation and citation omitted). "The burden of proof rests with the party seeking to overturn the agency's decision." Id. at ¶ 9. At issue is the construction of the statutory scheme establishing pension benefits, that is a question of law for the court. Spiller v. State, 627 A.2d 513, 515 (Me. 1993).

There is no dispute that Leavitt had fewer than five years of creditable service and that her condition pre-existed her membership in the system. Hence, her application for disability retirement benefits based upon this condition is reviewed under the provisions of 5 M.R.S.A. § 17924 (2), which provides that in order to be eligible for disability retirement benefits, a member must demonstrate that the pre-existing condition was "substantially aggravated by an accident or injury received in the line of duty but from events or circumstances not usually encountered within the scope of the member's employment."[3]

As a preliminary matter, the court will assume, without deciding, that Leavitt falls under the statutory definition of "disabled."[4] Now, at the heart of this dispute is

3. Title 5 M.R.S.A. § 17924 (2) states in its entirety:

A member with fewer than 5 years of continuous creditable service immediately preceding that member's application for a disability retirement benefit is not eligible for that benefit if the disability is the result of a physical or mental condition which existed before the member's membership in the retirement system, unless the disability is a result of, or has been substantially aggravated by, an injury or accident received in the line of duty but from events or circumstances not usually encountered within the scope of the member's employment.

4. "'Disabled' means that the member is mentally or physically incapacitated under the following conditions:
   A. The incapacity is expected to be permanent;
   B. That it is impossible to perform the duties of the member's employment position;
   C. After the incapacity has continued for 2 years, the incapacity must render the member unable to engage in any substantially gainful activity for which the member is qualified by training, education or experience; and

5

the parties' disagreement over (1) whether Leavitt's increased workload and EMTC's failure to make modifications were "event[s] or circumstance[s] not usually encountered within the scope of [Leavitt's] employment," and (2) whether these two factors substantially aggravated her spasmodic torticollis.

## A. Increased Workload

Leavitt argues that her increased workload was an event or circumstance not usually encountered in her position. The Board found that section 17964 (2) does not necessarily exclude an increased workload from qualifying as an event or circumstance not usually encountered within the scope of the member's employment, but that although the increased workload substantially aggravated her condition, "the job of distributing the mail after October, 1997, did not constitute an event or circumstance not usually encountered within the scope of [Leavitt's] employment." The Board held that because Leavitt's job description required her to distribute "incoming US mail and packages and campus mail," her task of distributing the interoffice mail was not a task that would be beyond the usual activities set forth in her job description and therefore was an event or circumstance usually encountered within the scope of her employment.

The court agrees. "Scope of employment" means "[t]he activities in which an employee engages in the carrying out of the employer's business which are reasonably foreseeable . . . ." BLACK'S LAW DICTIONARY 937 (Abr. 6th ed. 1991). Distributing interoffice mail was a foreseeable duty for one in Leavitt's position; her job description included the duty of distributing interoffice mail. The aggravation of Leavitt's condition was not, therefore, attributable to events outside the scope of her employment.

For the court to hold otherwise would skirt the purpose of the law. The objectives and policies behind the law are clear. The State does not want to "buy" new employees' disabilities that are reasonably expected to worsen simply by virtue of

---

D. The incapacity may be revealed by examinations or tests conducted in accordance with section 17926."

5 M.R.S.A. § 17910 (1).

being on the job and undertaking the duties ordinarily associated with the job.[5] There was, therefore, no event or circumstance beyond the scope of Leavitt's employment that caused or aggravated her disability. The Board's decision is, therefore, affirmed on this basis.

## B. Failure to Make Modifications

Leavitt also claims that EMTC's failure to make job modifications was an event or circumstance not usually encountered within the scope of her employment. The court disagrees, as the Legislature did not intend the phrase "events or circumstances not usually encountered within the scope of the member's employment" to include an employer's failure to make modifications. The statute provides:

> A member with fewer than 5 years of continuous creditable service immediately preceding that member's application for a disability retirement benefit is not eligible for that benefit if the disability is the result of a physical or mental condition which existed before the member's membership in the retirement system, unless the disability is a result of, or has been substantially aggravated by, an injury or accident received in the line of duty but from events or circumstances not usually encountered within the scope of the member's employment.

5 M.R.S.A. § 17924 (2). When construing a statute, the court must look first to the plain meaning of the statutory language as a means of effecting the legislative intent, and it will not construe statutory language to effect absurd, illogical, or inconsistent results. See Austin v. Austin, 2000 ME 61, ¶ 8, 748 A.2d 996, 1000. The Board held that it did not have to get to this question, as Leavitt had failed to prove that she was eligible for disability retirement benefits because the aggravation to her spasmodic torticollis was caused by duties within the scope of her employment. The court agrees with this assertion.

Further, in this court's view, an employer's failure to modify goes more to whether the member meets the statutory definition of "disabled" and whether the

---

5. Indeed, when enacting these changes, the Legislature stated:

This bill makes it clear that a disability resulting from a preexisting condition that has been aggravated by an injury or accident received in the line of duty must be an accident or injury *outside* the *usual* activities encountered in the member's employment.

L.D. 1125 (115th Legis. 1991) (emphasis added).

7

member can perform his or her duties, not to causation or aggravation of the disability. A reading of the statute and the legislative history indicates that the Legislature intended that the disability be substantially aggravated by an "injury" or "accident" received from events or circumstances not usually encountered within the scope of employment. The specific terms used by the Legislature, "injury" and "accident," connote one-time events that happen to a person. "Injury" means "[d]amage of or to a person . . . [; a] wound or other specific damage," WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 629 (1988), and "accident" is defined as "[a]n unexpected and undesirable event[; s]omething that occurs unexpectedly or unintentionally." Id. at 71. The court finds that the language used by Legislature does not include an employer's *course* of conduct. The court therefore affirms the Board's decision on this basis.

THE DOCKET ENTRY IS:

The decision of the Maine State Retirement System Board of Trustees is affirmed.

The clerk is directed to incorporate this decision into the docket by reference.

_____
Justice, Superior Court

DATED: May 23, 2002

8